UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ALBEMARLE CORPORATION, | § |
| | § |
|    Plaintiff, | § |
| | § |
| v. | §   CIVIL ACTION NO. 4:08-cv-3236 |
| | § |
| MEMC ELECTRONIC MATERIALS, INC. ET AL., | § |
| | § |
|    Defendants. | § |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants MEMC Electronic Materials, Inc.'s and MEMC Pasadena, Inc.'s ("Defendants" or "MEMC") Partial Motion to Dismiss with Brief in Support Thereof (Doc. No. 37), Defendants' Motion for Partial Summary Judgment and Memorandum in Support (Doc. Nos. 33 & 34), and Plaintiff's Motion for Partial Summary Judgment and Brief in Support (Doc. No. 32). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendants' Partial Motion to Dismiss should be granted, Defendants' Motion for Partial Summary Judgment should be granted in part and denied in part, and Plaintiff's Motion for Partial Summary Judgment should be granted in part and denied part.

### I.   BACKGROUND

This is a breach of contract suit arising out of the sale of a polysilicon manufacturing plant from Plaintiff Albemarle Corporation ("Albemarle") to MEMC. (Pl.'s Mot. for Partial Summ. J. and Br. in Supp., Doc. No. 32, at 2.)[1] On July 31, 1995,

---

[1] In considering the Rule 12(b)(6) motion to dismiss, the Court accepts the factual allegations in Albemarle's First Amended Complaint (Doc. No. 36) as true. *Frame v. City of Arlington*, 575 F.3d 432, 433-34 (5th Cir. 2009). In considering the summary judgment motions, the Court must view all evidence

Albemarle transferred the polysilicon plant, located in Pasadena, Texas, to MEMC through an Asset Purchase Agreement ("Agreement"). Prior to the transfer date, Albemarle had been engaged in the manufacture, marketing, and sale of polysilicon and other materials. The polysilicon manufactured by Albemarle was used by companies for the preparation of single crystal silicon ingots, later used to make semiconductor grade silicon wafers for use in electronic products. *Id.* After the execution of the agreement, Albemarle transferred the plant to MEMC, as well as intellectual property and other rights related to its polysilicon business. *Id.*

In partial consideration for the transfer of rights to MEMC, the Agreement provided that Albemarle would receive royalty payments from MEMC for certain quantities of polysilicon production over a fifteen-year period. (Doc. No. 32, Ex. A.) The Agreement also required MEMC promptly to provide Albemarle with notice in writing prior to or upon increasing the capacity of the plant, or making more than 1200 metric tons of polysilicon. The Agreement included a definition of polysilicon that is in dispute in this case.

MEMC has not provided any accounting of the polysilicon produced at the plant between January 1, 1996 and December 31, 2007, and has not made any royalty payments. (Pl.'s First Am. Compl., Doc. No. 36, at 6.)

Albemarle filed suit in this Court in October 2008, alleging breach of contract, prevented performance, and unjust enrichment claims. (*Id.* at 7-8.) MEMC now moves to dismiss, and both parties move for partial summary judgment.

---

in the light most favorable to the non-movant, and draw all reasonable inferences in the non-movant's favor. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The factual background offered by Albemarle appears to be undisputed. Thus, Court pulls relevant facts from Albemarle's complaint and summary judgment motion.

**II.     MEMC'S MOTION TO DISMISS**

    **A.  Rule 12(b)(6) Standard**

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not be sufficient. *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 555).

    **B. Analysis**

In Albemarle's amended complaint, it adds to its causes of action a claim of "prevented performance." (Doc. No. 36, at 7.) Albemarle contends:

> Defendants improperly claim the right to unilaterally set specifications for licensed product and thereby control whether any royalty is due to Albemarle. It is apparent that Defendants have improperly taken into their own hands the ability to determine whether or not they can be held liable under the contract. Defendants are therefore [liable] to Plaintiff under the prevented performance doctrine.

*Id.* MEMC argues that Albemarle's claim for prevented performance does not give notice of a legally sufficient claim, and is not a legally recognized cause of action. (Defs.' Partial Mot. to Dismiss with Br. in Supp. Thereof, Doc. No. 37, ¶¶ 5-6.)

Albemarle appears to concede this point in its response, stating that the "[t]he prevented performance doctrine may not be a cause of action in itself, but it can be embraced within a cause of action for breach of contract." (Pl.'s Resp. to Defs.' Partial Mot. to Dismiss with Br. in Supp. Thereof, Doc. No. 41, ¶ 3.)

The Court agrees. A review of Texas cases shows that the "doctrine" of prevented performance is simply a rule of contract law. *See, e.g.*, *Rich v. McMullan*, 506 S.W.2d 745, 747 (Tex. Civ. App.—San Antonio 1974, writ ref'd n.r.e). Courts discuss prevented performance arguments in the context of breach of contract or tortious interference causes of action, rather than treating them as stand-alone claims for relief. *See id.*; *Fluor Enters. v. Conex Int'l Corp.*, 273 S.W.3d 426, 442-43 (Tex. App.—Beaumont 2008, no pet.) The Court dismisses "prevented performance" as an independent claim for relief in Albemarle's petition. Instead, it will consider any relevant prevented performance argument in the context of Albemarle's breach of contract cause of action.[2]

---

[2] Prevented performance, however, appears to be inapplicable under the facts of this case. The Court understands Albemarle's argument as follows: MEMC has unilaterally determined the specifications of its polysilicon in order to remove the product from the Agreement's definition of polysilicon, thereby avoiding its contractual duties to pay royalties. This scenario is factually distinguishable from the prevented performance case cited by Albemarle. *See Rich v. McMullan*, 506 S.W.2d at 747 (noting that, where one

4

### III.  MEMC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. FED. R. CIV. P. 56(e)(1); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'" (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

#### B. Analysis

##### 1. Statute of limitations

---

party *prevented the other party* from performing a condition precedent to contract, that party may not then avail itself of the other party's nonperformance). In this situation, where Albemarle alleges that MEMC is preventing *its own* performance under the contract, the allegations are more properly viewed as a simple question of whether MEMC is heeding the contractual definition of polysilicon.

MEMC seeks summary judgment on Albemarle's breach of contract and unjust enrichment claims, arguing that they are barred by the statute of limitations. MEMC argues that, under Texas law,[3] Plaintiff's claims are subject to a four-year statute of limitations (*see* Defs.' Mot. for Partial Summ. J., Doc. No. 34, ¶ 7.). Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (Vernon 2008). Thus, MEMC urges that any and all of Albemarle's claims for non-payment of royalties, where the sale of qualifying product took place more than four years before Albemarle filed this lawsuit, are barred by limitations. This affects royalties from sales that took place before July 1, 2004.[4]

Albemarle appears to concede the date that MEMC offers for the date of accrual of the cause of action and commencement of the limitations offered. Albemarle argues, however, that MEMC may not prevail on this defense because of the doctrines of fraudulent concealment and the discovery rule. (Pl.'s Resp. to Defs.' Mot. for Partial Summ. J. and Br. in Supp., Doc. No. 39, at 1-5.)

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense." *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 530 (Tex. 1997). "When the plaintiff pleads the discovery rule as an exception to limitations, the defendant must negate that exception as well." *Id.* (citing *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 n.2 (Tex. 1988)).

MEMC filed no reply to Albemarle's fraudulent concealment and discovery rule claims, and does not so much as mention the discovery rule in its motion for summary judgment. Thus, defendant has failed to carry its burden "to negate the discovery rule by proving as a matter of law that no issue of material fact exists concerning when the

---

[3] Section 8.03 of the Agreement provides that the Agreement is governed by Texas law. (Doc. No. 32, Ex. A., at 10.)

[4] Under the Agreement, royalty payments accrued each calendar quarter. (Doc. No. 32, Ex. A., at 5.)

6

plaintiff discovered or should have discovered." *Woods*, 769 S.W.2d at 518 n.2 (citing *Missouri-Kansas-Texas R.R. Co. v. City of Dallas*, 623 S.W.2d 296, 298 (Tex. 1981)). The Court denies summary judgment on MEMC's statute of limitations claim.

### 2. Unjust enrichment

As its second argument in favor of partial summary judgment, MEMC argues that Albemarle's unjust enrichment claim is "simply a claim for quantum meruit." (Doc. No. 34, ¶ 9.) Quantum meruit, MEMC asserts, is an equitable remedy independent of a contract, and does not apply when, as here, there is a valid, express contract covering the subject matter. (*Id.*)

Albemarle responds that quantum meruit and unjust enrichment are two different theories: quantum meruit is based on an implied agreement to pay for goods or services, whereas unjust enrichment affords a remedy against a person who has obtained a benefit from another by fraud, duress, or undue advantage. (Doc. No. 39, at ¶¶ 11-12.) Albemarle further states, however, that, if MEMC concedes that there is a valid and binding contract between the parties, then Albemarle agrees that an equitable unjust enrichment claim is not needed in this case.

As an initial matter, while quantum meruit and unjust enrichment may overlap, they are not coextensive theories of recovery. Quantum meruit "is an equitable theory of recovery intended to prevent unjust enrichment when there is an implied agreement to pay for goods or services provided," while unjust enrichment "characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *R.M.*

7

*Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App.—Waco 2008, pet. denied).

A plaintiff who seeks to recover under an unjust enrichment theory "will be precluded from recovering . . . if there is an express contract covering those services or materials and if no exception to the principle applies." *Jupiter Enters. v. Harrison*, 2002 WL 318305, at *4 (Tex. App.—Dallas 2002). Here, Albemarle has argued no exceptions, such as contract invalidity or abandonment. *Id.* Indeed, both Albemarle and MEMC agree that a "valid, express contract between the parties exists that covers the payment of royalties at issue." (Doc. No. 34, ¶ 10.) Nowhere in the record does the Court find evidence that Albemarle performed extra work or transferred extra assets not covered by the Agreement. Neither party asserts that Albemarle performed more than its contractual obligation. Thus, because the Agreement covers fully the dispute between the parties, Albemarle may not recover on an equitable unjust enrichment theory. The Court dismisses the unjust enrichment claim.

### IV. ALBEMARLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A. Summary Judgment Standard

The Court employs the same summary judgment standard outlined *supra* at Part III.A.

#### B. Analysis

Albemarle seeks summary judgment on three issues. First, Albemarle urges the Court to find that the Agreement's definition of polysilicon is unambiguous and requires MEMC to pay royalties for both dehydrogenated and non-dehydrogenated polysilicon. Second, Albemarle argues to the Court that the contract does not have an end use

8

requirement upon which royalty payments depend. Third, Albemarle seeks summary judgment on the question of whether MEMC may unilaterally change product specifications from those in place at the time the Agreement took effect.

### 1. Polysilicon definition

The Agreement provides that Albemarle shall receive a royalty of one dollar per kilogram of licensed product sold by MEMC in excess of 1200 metric tons. Licensed product is defined as polysilicon, which, in turn, is defined as follows:

> "Polysilicon" shall collectively mean polysilicon which meets the specifications required for the preparation of semiconductor silicon and polysilicon which meets the specifications required for the preparation of semiconductor silicon and which, in addition, has been upgraded by dehydrogenation. "Polysilicon" shall not include polysilicon which is unsuitable for the manufacture of semiconductor grade silicon wafers.

(Doc. No. 32, Ex. A.) Albemarle argues that the "touchstone for the royalty obligation is whether the polysilicon is suitable for semiconductor use." (Doc. No. 32, at 7.) That is, both dehydrogenated and non-dehydrogenated polysilicon that meet the specifications for semiconductor silicon meet the Agreement's definition of polysilicon. A construction which allowed only dehydrogenated polysilicon to qualify as "polysilicon" would moot the first clause of the definition, Albemarle urges.

In response, MEMC states that the Agreement's definition of polysilicon is ambiguous because the last sentence excludes semiconductor polysilicon, which would otherwise fall under the definition, if the polysilicon is unsuitable for the manufacture of semiconductor grade silicon wafers. The word "unsuitable," MEMC argues, is an undefined term which encompasses non-dehydrogenated polysilicon.

The parties' correspondence documents their disagreement. In a letter dated July 21, 2008, Phillip Devrou of Albemarle formally demanded that MEMC comply with its

9

obligation to provide written notice of polysilicon manufacturing data. (Doc. No. 39, Ex. A-2.) Craig Murphy of MEMC responded that, as a result of modification of growing processes, MEMC had ceased performing dehydrogenation on polysilicon. The letter indicates that MEMC considers dehydrogenated polysilicon as the only polysilicon eligible for royalty payments under the agreement. (Doc. No. 32, Ex. B).

The question of whether a contract is ambiguous is a question of law for the Court to decide. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980) (citations omitted). The primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *Id.* at 518-19 (citing *Citizens Nat'l Bank v. Tex. & P. Ry. Co.*, 150 S.W.2d 1003 (Tex. 1941)). "To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951)). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.* (citations omitted). When a court applies these principles, it will find a contract unambiguous if it can be given a "definite or certain legal meaning." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996)). If a contract is susceptible to two or more reasonable interpretations after applying these rules of construction, however, the contract is ambiguous. *Id.* "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument

becomes a fact issue." *Coker*, 650 S.W.2d at 394 (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1980)).

In this case, we cannot give the definition of polysilicon a definite or certain legal meaning because it is unclear whether the last sentence in the definition, which defines what polysilicon is *not*, conflicts with the first sentence. In other words, does polysilicon which meets the specifications required for the preparation of semiconductor silicon differ from polysilicon that is suitable for the manufacture of semiconductor grade silicon wafers? MEMC suggests that the second clause encompasses non-dehydrogenated polysilicon, thereby positioning the two sentences of the clause in direct conflict with one another. We cannot disagree with MEMC on the basis of the Agreement's terms. The first sentence simply refers to polysilicon used for the preparation of semiconductor silicon, whereas the last sentence refers to the suitability of manufacture of semiconductor grade silicon wafers. Applying the principle of giving effect to every contract provision, the Court will not give effect to the first sentence, which undoubtedly encompasses both dehydrogenated and non-dehydrogenated polysilicon, and then ignore the different wording of the second sentence, which uses different terms to define polysilicon. It is entirely possible that the second sentence could affect a definition inclusive of both dehydrogenated and non-dehydrogenated polysilicon. Though Albemarle urges that the two sentences mean the same thing, this Court simply has no way of assessing that argument by reading the Agreement's terms. Moreover, the Court receives no guidance on the issue from the remainder of the Agreement.

Thus, the Court cannot accept Albemarle's position that the fact that polysilicon must also be suitable for semiconductor wafers does not prove that the Agreement

requires the polysilicon to be dehydrogenated before royalty is due. Because the Court finds the Agreement to be ambiguous on the definition of polysilicon, summary judgment is improper on this issue. The definition is a genuine issue of material fact.

### 2. End use of polysilicon

As its second point on summary judgment, Albemarle urges the Court that the Agreement unambiguously requires royalty to be paid for polysilicon that meets semiconductor specifications, regardless of the ultimate end use of the product. Again, the operative language is as follows:

> "Polysilicon" shall collectively mean polysilicon which meets the specifications required for the preparation of semiconductor silicon and polysilicon which meets the specifications required for the preparation of semiconductor silicon and which, in addition, has been upgraded by dehydrogenation. "Polysilicon" shall not include polysilicon which is unsuitable for the manufacture of semiconductor grade silicon wafers.

(Doc. No. 32, Ex. A.) MEMC argues that the same ambiguity, that is, the exclusion of polysilicon that is unsuitable for the manufacture of semiconductor grade silicon wafers, allows for the interpretation that for polysilicon to fall under the Agreement terms, it must be ultimately used to manufacture semiconductor grade silicon wafers.

Using the principles of contract law outlined above, the Court disagrees with MEMC's position. Nowhere in the operative clause or elsewhere does the Agreement state that royalty is not due unless the material is actually used to manufacture silicon wafers. The Agreement states in plain terms that polysilicon must simply meet the specifications required for the preparation of semiconductor silicon, and must be suitable for the manufacture of silicon wafers. It depends on these specifications only. It is of no moment what actually happens to the qualifying polysilicon once it is sold by MEMC. As Albemarle notes, and MEMC does not contest, the plant simply produces granular

polysilicon, and the decision of end use of the product is made by the company who buys the granular polysilicon from MEMC. End products are not manufactured in the plant. The terms of the Agreement in no way contemplate that royalty payments will depend on what the purchaser company decides to do with the polysilicon. The Agreement simply sets a standard for the grade of polysilicon by making reference to semiconductors. The semiconductor terms, however, do not dictate what the end use of the product must be. They only dictate the quality of polysilicon that triggers royalty payments.

The Court grants summary judgment to Albemarle on its end use argument.

### 3. Varying product specifications

The Agreement's definition of polysilicon makes reference to the specifications required for the preparation of semiconductor polysilicon. As its last argument on summary judgment, Albemarle urges that MEMC cannot avoid royalty payments by unilaterally changing the specifications referenced in the Agreement. Indeed, MEMC relayed to Albemarle that, due to modifications of growing processes, certain classifications of polysilicon had changed at the plant. (Doc. No. 32, Ex. B.)[5] Albemarle objects to variable specifications of polysilicon, arguing that the polysilicon specifications referenced in the contract were those specifications in place at the inception of the Agreement. Albemarle points out that the Agreement made no allowance for specifications changing over time. MEMC, predictably, provides a valid counterpoint: while the Agreement does not state that specifications may change over time, neither does it tie specifications to those in place at the time the Agreement took effect. MEMC takes the position that "the specifications required for the preparation of

---

[5] Albemarle further asserts, and MEMC does not dispute, that MEMC has produced in discovery over thirty iterations of polysilicon specifications with varying components. (Doc. No. 32, at 9.)

semiconductor silicon" are the specifications in use by Defendants at the time of production, and therefore are permitted to vary over time.

Albemarle's position is sympathetic. Permitting MEMC to vary polysilicon specifications after a valid contract takes effect would allow MEMC to avoid royalty payments simply by altering specifications for the preparation of semiconductor silicon, even where the original specifications remained sound by industry standards.

However, Albemarle has not given the Court any contractual basis on which to find in its favor. The Agreement does not define "specifications," and so the Court must look to the plain meaning of the term. *De Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 722-23 (Tex. App.—Houston [14 Dist.] 2005, pet. denied). "Specification" is defined as "[t]he act of making a detailed statement, [especially] of the measurements, quality, materials, or other items to be provided under a contract," and, where used as a noun, "[t]he statement so made." BLACK'S LAW DICTIONARY 1528 (9th ed. 2009). Of course, this definition does not tell us whether the detailed statements regarding measurements and quality should be ones in use at the time the Agreement was effected, or may change over time. Albemarle urges the Court not to adopt a construction that would allow MEMC to avoid royalty payments and instead apply the "much more logical and settled approach" that would measure royalty obligation by the specification that was in place at the inception of the Agreement. This argument certainly appeals to the Court's common sense. However, the Court may not rewrite the text of the Agreement based on a sensible argument. Where the Agreement failed to define which specifications were to be used, the Court may not now decide between different sets of specifications.

The Court does agree with Albemarle that whether the polysilicon meets semiconductor specifications is an objective question, but the Court is not in a position to decide now whether Albemarle's, MEMC's, or both parties' specifications meet objective standards for preparation of semiconductor silicon.

The question of which specifications should be used now becomes a question of the intent of the parties, a question left to the factfinder.[6] Summary judgment is denied on this point.

## V.  CONCLUSION

MEMC's Partial Motion to Dismiss with Brief in Support Thereof (Doc. No. 37) is **GRANTED**.  MEMC's Motion for Partial Summary Judgment and Memorandum in Support (Doc. Nos. 33 & 34) is **DENIED** as to the statute of limitations claim and **GRANTED** as to the unjust enrichment claim.  Albemarle's Motion for Partial Summary Judgment and Brief in Support (Doc. No. 32) is **DENIED** as to the polysilicon definition and specifications arguments, and **GRANTED** as to the end use argument.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 10th day of February, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[6] The parties have submitted affidavits to the Court regarding specifications used at the plant and in the industry for preparation of semiconductor silicon.  At least some of the evidence appears to violate the parol evidence rule by attempting to add to the definition of specifications in the Agreement, rather than describing "the circumstances surrounding the execution" of the Agreement.  *Ganske v. Spence*, 129 S.W.3d 701, 707 (Tex. App.—Waco 2004, no pet.).  The Court need not decide that question, however, because whether it considers the evidence or dismisses it as violative of the parol evidence rule, the result will be the same—there remains an issue of fact on which specifications are to be used under the Agreement.

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**