UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ALBEMARLE CORP., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 4:08-cv-3236 |
| § | |
| MEMC ELECTRONIC MATERIALS, § | |
| INC. ET AL., § | |
| § | |
| Defendants. § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties in this case are Plaintiff Albemarle Corporation ("Albemarle"), and Defendants MEMC Electronic Materials, Inc. and MEMC Pasadena, Inc. (collectively "MEMC"). The case was tried to the Court on March 11 and 12, 2010. The parties have submitted post-trial briefing. Pursuant to Federal Rule of Civil Procedure 52, the Court's Findings of Fact and Conclusions of Law are set forth below.

### I.   FINDINGS OF FACT

1. Before July 31, 1995, Albemarle manufactured, marketed, and sold polysilicon at its plant in Pasadena, Texas ("the Polysilicon Plant").

2. On July 31, 1995, Albemarle Corporation sold and transferred the Polysilicon Plant to MEMC, as well as intellectual property and other rights related to its polysilicon business through an Asset Purchase Agreement. (Joint Ex. 1 & 2.)

3. MEMC has been manufacturing polysilicon at the Polysilicon Plant since the July 31, 1995 transfer.

4.  The Asset Purchase Agreement included the Seller Technology License Agreement ("STLA") which provided Albemarle would receive royalty payments from MEMC for certain quantities of polysilicon production over a fifteen-year period. The relevant provision states:

    In partial consideration for the rights granted herein, Albemarle shall receive a royalty for sales of Licensed Product manufactured at the Polysilicon Plant during the fifteen (15) year period immediately following the Closing Date as set forth below:

    (a) for each kilogram of Licensed Product sold by MEMC Pasadena to its Affiliates and to third parties in a calendar year in excess of 1200 metric tons but not in excess of 2500 metric tons, Albemarle shall receive a royalty of one dollar ($1.00), and

    (b) for each kilogram of Licensed Product sold in a calendar year in excess of 2500 metric tons, Albemarle shall receive a royalty to be determined by MEMC and Albemarle pursuant to a good faith negotiation as described in Section 2.06.

    (Joint Ex. ¶ 2.04.)

5.  The STLA provides a definition for "Licensed Product," stating:

    "Licensed Product" shall mean Polysilicon which embodies, is made by or with the use of, or is used in accordance with, an invention defined by one or more claims of the Polysilicon Patent Rights or is made using the Polysilicon Manufacturing Technology.

    (*Id.* ¶ 1.05.)

6.  The STLA also defines the disputed term at issue here, "Polysilicon":

    "Polysilicon shall collectively mean polysilicon which meets the specifications required for the preparation of semiconductor silicon and which, in addition, has been upgraded by dehydrogenation. "Polysilicon" shall not include polysilicon which is unsuitable for the manufacture of semiconductor grade silicon wafers.

    (*Id.* ¶ 1.09.)

2

7. The two terms in dispute in this case are "specifications" and "unsuitable." The STLA does not define these terms.

8. MEMC has not tendered royalty payments to Albemarle to date.

9. David DeCuir testified at trial that the specifications in place at the time of the Polysilicon Plant's transfer used "boron, phosphorous, carbon, and total metals as the specification for [Albemarle's] semiconductor grade [polysilicon]." (Tr. 1-91, lines 7-8.) He further testified that the specifications for those elements were as follows:

   0.3 ppba for Boron
   0.3 ppba for Phosphorous
   0.3 ppma for Carbon
   10 ppba for Total Metals

   ("1995 specifications") (Tr. 1-91, lines 11-13.) DeCuir testified that MEMC, Albemarle's main customer before the Polysilicon Plant transfer, bought polysilicon at these specifications. (Tr. 1-91, line 25- Tr. 1-92, line 1.) Finally, DeCuir testified that, when the Polysilicon Plant was under Albemarle's control, no customer complained that it could not use the 1995 specifications. (Tr. 1-92, lines 2-4.)

10. DeCuir could not produce a specific document publishing the 1995 specifications. (Joint Ex. 7, at 1.) DeCuir did present, however, a copy of a quality presentation that confirmed these specifications. (Pl. Ex. 14.) In addition, Albemarle produced 1990-1996 production records that confirm DeCuir's testimony. (Pl. Ex. 16.)[1]

---

[1] The Court finds that Plaintiff's Exhibits 14 and 16 are admissible as business records under Federal Rule of Evidence 803(6).

3

11. MEMC offers Joint Exhibit 77 as establishing the relevant set of specifications. Joint Exhibit 77, entitled "Norma Operativa di Incoming," lists substantially more stringent specifications than that offered by Albemarle. The exhibit itself, however, is unidentified, and no witness was able to provide credible testimony showing that Joint Exhibit 77 was actually sent by MEMC to Albemarle prior to the Polysilicon Plant transfer. Contrary to MEMC's assertions, De Luca did not testify that the specifications listed in Joint Exhibit 77 were sent to Albemarle at any time. Instead, MEMC's attorney testified to that fact himself. Neither does the Court find convincing the testimony on this point of Sharon Bradley, or that of Peter Normington. Neither of them expressed credible personal knowledge on the precise question of whether MEMC send Albemarle these specifications. Therefore, the Court is unable to conclude on that basis that the Joint Exhibit 77 specifications were ever sent to Albemarle or governed polysilicon production between the two parties.

12. The parties agree that there is no industry-wide standard for specifications of semiconductor grade polysilicon. Albemarle witness Peter Normington testified to this fact. (Tr. 2-132, lines 17-22.) Normington testified further that the 1995 specifications were within the range of acceptable specifications in the semiconductor industry. (Tr. 2-143, lines 12-20.)

13. Based on this testimony, the Court concludes that the specifications submitted by Albemarle via DeCuir's testimony were the specifications in place at the time of the Polysilicon Plant transfer.

14. The Court also concludes that the "specifications" listed in paragraph 1.09 of the STLA reference the specifications submitted by Albemarle.

15. The parties intended for the 1995 specifications above to constitute the specifications referenced in paragraph 1.09 of the STLA.

16. The meaning of the second ambiguous word, "unsuitable," was testified to by a number of witnesses. Michael Wilhelm, Albemarle's chief negotiator for the Polysilicon Plant transfer, testified that his understanding was that materials which did not meet the 1995 specifications would be "unsuitable" under the STLA and thus would not count towards the royalty payment. (Tr. 2-56, lines 12-25.)

17. Richard Sabalot, the lead commercial attorney involved in drafting the parties' agreement, testified that he believed that polysilicon which was "unsuitable" for the manufacture of semiconductor grade silicon wafers was simply another way of referring to polysilicon that did not meet specifications, as required by the first sentence. (Tr. 2-89, line 24 to 2-91, line 1.) In other words, Sabalot testified that the second sentence in paragraph 1.09 was simply a reiteration of the first sentence, and did not hold any independent meaning. (*Id.*)

18. MEMC's witness, Charles Cook, testified that the second sentence of paragraph 1.09, which contains the word "unsuitable," was intended to mean that Defendants would not owe a royalty on granular polysilicon that met specifications but was not commercially and economically manufacturable in the production of semiconductor grade silicon wafers, as opposed to a product that could be made at some great expense.  (Tr. 2-243, line 1 to 2-245, line 4.)

19. After considering the witnesses' testimony, and reviewing the other evidence in the record, the Court concludes that the proper interpretation of the second sentence of paragraph 1.09 is that "unsuitable" refers to polysilicon that does not meet the 1995 specifications.

## II.   CONCLUSIONS OF LAW

1. This Court has personal jurisdiction over the parties and subject matter jurisdiction over this dispute.

2. Venue is proper in this Court.

3. Albemarle's claims for prevented performance and unjust enrichment were dismissed prior to trial.  (Doc. No. 42.)

4. The Court granted partial summary judgment to Albemarle before trial on MEMC's "end user" argument.  (Doc. No. 42.)

5. MEMC proffered no persuasive evidence at trial on the statute of limitations issue.  This point is overruled.

6. To prove a claim for breach of contract, a party must establish: (a) a valid contract; (b) the party performed or tendered performance; (c) the opposing party breached the contract; and (d) the party was damaged as a result of that breach. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2006, pet. denied).

7. The STLA is a valid and enforceable agreement.

8. Albemarle performed its obligations under the STLA.

9. All conditions precedent to MEMC's performance occurred.

10. MEMC breached its obligations under the STLA.

11. Albemarle has been damaged as a result of the breach. It has received no royalty payments since the Polysilicon Plant transfer occurred.

12. The Court comes to these conclusions substantially on the basis of the party's prior course of dealings, combined with witness testimony. The Court finds that the prior conduct of MEMC and Albemarle, wherein MEMC purchased polysilicon from Albemarle, constituted a course of dealing that validates Albemarle's interpretation of the ambiguous "specifications" and "unsuitable" terms. A course of dealing is a "sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 2010 WL 1463451, at *13 (S.D. Tex. Apr. 12, 2010) (quoting Restatement

(Second) of Contracts § 223). It is uncontroverted that MEMC was Albemarle's main customer prior to the Polysilicon Plant transfer, and was purchasing and using the polysilicon created there. By 1995, MEMC was buying and using some 500 metric tons of polysilicon. (Tr. 1-89, line 9 to 1-90, line 25.) MEMC's current position is that the polysilicon it was buying and using during the pre-transfer years is "unsuitable" under the STLA. (Tr. 2-285 line 25 to 2-286, line 5.) The Court cannot ignore the history between the two parties and adopt such a strained interpretation of the STLA. Courts "will construe a contract in favor of mutuality of obligation." *Hackberry Creek*, 205S.W.3d at 46. "Additionally, courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Id.* (citing *Frost Nat'l Bank*, 165 S.W.3d 310, 311 (Tex. 2005).[2] Adopting MEMC's interpretation of the contract would be unreasonable and oppressive because it would exempt MEMC from its royalty payments under the STLA. The Court cannot believe that the threshold to suitability was intended by the parties to be so high that the pre-transfer polysilicon would not even be suitable under the STLA. It found no evidence that Albemarle agreed to contract to a

---

[2] Much of the case law cited by the Court applies these construction principles at the summary judgment phase. Nevertheless, the Court finds the principles to provide guidance at the final judgment stage as well, particularly where, as here, the parties have a long and settled course of conduct.

8

quality of polysilicon that apparently did not exist in the pre- (or post-) transfer years.

13. The Court notes that Albemarle's position that "unsuitability" simply referred to material not meeting specifications is supported by numerous MEMC witnesses whose testimony was submitted through post-trial deposition designations. Sean Hunkler, the senior vice president of customer advocacy for MEMC agreed that if material meets specifications, then it is suitable for the manufacture of semiconductor grade silicon wafers. (Hunkler Dep. 57:24-58:6.) Craig Murphy, MEMC's vice president of polysilicon manufacturing, testified that the second sentence of paragraph 1.09 did not add anything to the first sentence of that same paragraph, which simply requires that polysilicon meet specifications. (Murphy Dep. 86:14-22.) Rich Booher, MEMC's site manager, testified that the second sentence of paragraph 1.09 was a reiteration of the first. (Booher Dep. 67:14-68:5.)[3]

14. The Court does not find the term "manufacture" to be ambiguous. Manufacture simply means "to make from raw materials by hand or by machinery." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 757 (Frederick C. Mish et al., 11th ed. 2003). MEMC attempts to add profitability and economic considerations to the term, but the Court

---

[3] MEMC objects to Albemarle's post-trial designation of deposition testimony. The Court made allowances for such designations in its pretrial conference with the parties. MEMC's objections are overruled.

9

rejects these attempts. The Court finds that the word is concerned with only fabrication itself.

15. Albemarle is entitled to judgment in its favor.

16. The parties shall submit, within thirty (30) days of the date of this order, a damages assessment consistent with the findings and conclusions herein.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 16th day of August, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**